2007-NMSC-016

156 P.3d 30

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Clarence HARBISON, Defendant–Petitioner.**

No. 29,597.

Supreme Court of New Mexico.

April 10, 2007.

Rehearing Denied April 10, 2007.

John Bigelow, Chief Public Defender, Cordelia A. Friedman, Assistant Appellate Defender, Santa Fe, NM, for Petitioner.

Patricia A. Madrid, Attorney General, Martha Anne Kelly, Assistant Attorney General, Santa Fe, NM, for Respondent.

## OPINION

BOSSON, Justice.

{1} The opinion filed on February 5, 2007, in this case is withdrawn and the following substituted therefor.

{2} In this opinion, we decide two questions bearing on the requirements under the Fourth Amendment of the United States Constitution for a valid seizure: (1) when is a person who does not submit to a show of authority considered seized; and (2) when may a person's flight upon the arrival of police be taken into account in determining whether the officers had reasonable suspicion to conduct an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Applying the analysis set forth by the United States Supreme Court in *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), and *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), we conclude that under the Fourth Amendment there is no seizure and, thus, no requirement for reasonable suspicion until the individual actually submits to a show of authority. We also conclude that an individual's flight may properly be considered in determining the existence of reasonable suspicion unless that flight can be considered unlawfully provoked. We therefore affirm the Court of Appeals and reverse the district court's order suppressing the evidence against Defendant Clarence Harbison for lack of reasonable suspicion.

## BACKGROUND

{3} On the evening of June 13, 2003, detectives from the Albuquerque Police Department's Northeast Impact Team organized and executed an undercover "buy-bust" operation in a northeast Albuquerque neighborhood after receiving reports of the prevalence of drugs and drug dealing in that area. Posing as a drug purchaser, Detective Potter drove into the parking lot of an apartment complex and purchased a rock of crack cocaine from a subject later identified as Lawrence Clark for twenty dollars. As he drove away, Detective Potter radioed the other members of his team to inform them of the buy and gave a description of Clark.

{4} Within one minute of Detective Potter's cocaine purchase, the remaining members of the "arrest team" arrived in two vehicles and observed a group of eight to ten people gathered in front of a building at the far end of the parking lot from where the drug transaction had occurred. In addition to this group standing outside, there were two cars with a total of four people in them in the immediate vicinity of the group. Detective Soto, the officer who ultimately arrested Defendant, testified that as he approached he could see a subject who fit Detective Potter's description of Clark among the group. Defendant was also in this group, though not immediately next to Clark. The officers did not observe any interaction between Defendant and Clark as they approached.

{5} As the detectives got out of their cars, the group began to scatter. Clark attempted to run but was quickly overtaken and placed under arrest. Defendant also split off from the group, in the opposite direction from Clark, in what Detective Soto described as a "slow run." This caught Detective Soto's attention, and he pursued Defendant with his gun drawn yelling for Defendant to stop. Defendant did not stop immediately and Detective Soto continued following him telling him to get down on the ground. Detective Soto told Defendant to stop three or four

times before Defendant responded by stopping in front of a vehicle parked in the lot. When Defendant stopped, he went to his knees and threw something underneath the car. Detective Soto placed Defendant in handcuffs and looked under the car to see what Defendant had thrown. He found a broken glass crack pipe, a lighter, and a small piece of what was later identified as crack cocaine. Detective Soto testified that, as he turned back around to face Defendant, he noticed that Defendant "had his finger in his coin pocket" and was attempting to remove something, at which point Detective Soto reached into Defendant's pocket and retrieved a second rock of crack cocaine. Defendant was formally arrested and charged with possession of crack cocaine, tampering with evidence, and possession of drug paraphernalia.

{6} Defendant filed a motion to suppress evidence, claiming that Officer Soto lacked reasonable suspicion when he pursued and seized Defendant. The district court entered an order granting Defendant's motion and the State appealed. Reversing the district court's order, the Court of Appeals first held that Defendant had not abandoned the evidence because Officer Soto had seized Defendant prior to Defendant throwing the drugs and paraphernalia under the car. *See State v. Harbison,* 2006–NMCA–016, ¶¶ 14–15, 139 N.M. 59, 128 P.3d 487. Next, the Court of Appeals held that Officer Soto had reasonable suspicion when he seized Defendant based on Defendant's presence in a group with a person who had just completed a drug transaction combined with Defendant's flight upon the arrival of the police. *Id.* ¶ 27.

{7} We granted certiorari in part based on Defendant's arguments that the opinion of the Court of Appeals is inconsistent with New Mexico case law. *See* NMSA 1978, § 34–5–14(B)(1), (2) (1972); Rule 12–502(C)(4)(a), (b) NMRA. Upon review, we are persuaded that this appeal presents issues of first impression and that the Court of Appeals' opinion appropriately applied federal constitutional law.

**STANDARD OF REVIEW**

{8} "The standard of review for suppression rulings is whether the law was correctly applied to the facts, viewing them in a manner most favorable to the prevailing party." *State v. Jason L.,* 2000–NMSC–018, ¶ 10, 129 N.M. 119, 2 P.3d 856 (quoted authority omitted). In conducting our review, "we observe the distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *State v. Nieto,* 2000–NMSC–031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (alteration in original) (quoted authority omitted). Determinations of reasonable suspicion are reviewed de novo. *See Jason L.,* 2000–NMSC–018, ¶ 19, 129 N.M. 119, 2 P.3d 856.

{9} Defendant makes no argument on appeal that the New Mexico Constitution affords him greater protection than that afforded under the United States Constitution. Therefore, our analysis proceeds under the Fourth Amendment of the United States Constitution and is governed by federal constitutional law as set forth by the United States Supreme Court. *See State v. Walters,* 1997–NMCA–013, ¶ 9, 123 N.M. 88, 934 P.2d 282 (recognizing when defendant fails to present argument that state constitution provides greater protection than federal constitution, we assume protection is the same under both).

**SEIZURE**

{10} In determining whether Defendant was seized in violation of the Fourth Amendment, our first inquiry is at what moment Defendant was seized: when Detective Soto pursued Defendant ordering him to stop, or when Defendant in fact stopped? The point at which the seizure occurs is pivotal because it determines the point in time the police must have reasonable suspicion to conduct an investigatory stop. *See Hodari D.,* 499 U.S. at 623–24, 111 S.Ct. 1547. More particularly, if Defendant was not seized at the time he discarded the contraband, then the evidence would be considered abandoned and Fourth Amendment protections would not apply. We also note and subsequently discuss the question of whether the police had a basis for an investigatory stop at the time they arrived on the scene. We do so to address the issue of whether

Defendant's flight might have been unlawfully provoked and thus not an appropriate part of a reasonable suspicion analysis under *Wardlow.*

{11} Under *Terry,* a seizure occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." 392 U.S. at 16, 88 S.Ct. 1868. Our courts have held that a restraint on a person's freedom, within the meaning of *Terry,* can result either from the application of physical force or by a showing of authority. *Jason L.,* 2000–NMSC–018, ¶ 15, 129 N.M. 119, 2 P.3d 856 (citing *State v. Lopez,* 109 N.M. 169, 170, 783 P.2d 479, 480 (Ct.App.1989)). In making our determination, "we consider all of the circumstances surrounding the incident in order to determine whether a reasonable person would have believed that he [or she] was not free to leave." *Id.* (alteration in original) (quoted authority omitted). In *Jason L.* we identified examples of circumstances that might indicate a seizure in a given incident. Such circumstances include "'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* ¶ 16 (quoting *Lopez,* 109 N.M. at 170, 783 P.2d at 480).

{12} Three of these four examples were present in the instant case in the parking lot when the police arrived. Thus, there is no question of a show of authority at the time the detectives drew their weapons and gave orders for people to stop moving. If Defendant had immediately submitted to this show of authority, then he would have been seized at that time and we would apply a reasonable suspicion analysis as of that time. However, Defendant did not immediately submit to Detective Soto's show of authority; instead, he fled when the officers arrived and contin-

ued to move away from Detective Soto at a "slow run."[1] Pursuing Defendant with his gun drawn, Detective Soto had to repeat his command for Defendant to stop three or four times before Defendant finally dropped to his knees behind the car where he threw the drugs and paraphernalia.

{13} Therefore, our initial question is whether a person like Defendant who does not submit to a show of authority is considered seized within the meaning of the Fourth Amendment at the time police authority is first shown, requiring reasonable suspicion at that moment. The United States Supreme Court has answered this question in the negative. *See Hodari D.,* 499 U.S. at 626, 111 S.Ct. 1547. In *Hodari D.,* Hodari was standing on a street curb in a high crime area when he noticed an unmarked police cruiser approaching. *Id.* at 622–23, 111 S.Ct. 1547. Hodari fled and the officers in the cruiser gave chase. *Id.* at 623, 111 S.Ct. 1547. As he ran, Hodari discarded what was later determined to be a rock of crack cocaine. *Id.* The issue before the United States Supreme Court was whether a person who flees in the face of a "show of authority" by an officer is considered seized at the moment of flight under the Fourth Amendment. *Id.* at 624–25, 111 S.Ct. 1547. The Court held that a seizure based on a show of authority, as opposed to physical force, requires "*submission* to the assertion of authority." *Id.* at 626, 111 S.Ct. 1547; *see also State v. Rector,* 2005–NMCA–014, ¶ 6, 136 N.M. 788, 105 P.3d 341 ("[A] seizure 'requires either physical force ... or, where that is absent, submission to the assertion of authority.'" (quoting *Hodari D.,* 499 U.S. at 626, 111 S.Ct. 1547)). Therefore, Hodari was not yet seized, and no reasonable suspicion was required, at the time he abandoned the contraband during flight. *See Hodari D.,* 499 U.S. at 624 n. 1, 111 S.Ct. 1547 (relying on State's concession that the officer did not have the reasonable suspicion to justify stopping Hodari, but sug-

1. Defendant complains of the Court of Appeals' statement that "Defendant fled from Detective Soto at a 'slow run,'" arguing that this was an improper substitution, based on "isolated testimony," for the District Court's finding that "Defendant hurried north toward Zuni." Defendant claims that this "new finding" led the Court of Appeals to improperly analyze the case under

federal law addressing flight from officers in the context of reasonable suspicion. We find Defendant's claimed error to be a distinction without a difference. Whether Defendant is said to have fled the group at a slow run or hurried north away from the officers, the fact remains that he fled the scene of a recent drug transaction upon arrival of the police.

gesting that it is arguably against common sense to say that "it [is] unreasonable to stop, for brief inquiry, young men who scatter in panic upon the mere sighting of the police").

{14} *Hodari D.* dictates that under the Fourth Amendment no seizure of Defendant occurred until he yielded to Officer Soto's commands to stop. Thus, we analyze reasonable suspicion at the moment of the actual seizure, when Defendant stopped and submitted to Officer Soto, not earlier at the parking lot when the police approached and ordered everyone not to move. We agree with the district court and the Court of Appeals that at the time Defendant threw the evidence under the car he had already stopped in response to the show of authority and was under police seizure. Because Defendant had not abandoned the evidence before he was seized, Fourth Amendment protections apply to the evidence. We therefore determine whether, at the time of seizure, the officer had reasonable suspicion to conduct an investigatory stop of Defendant.

## REASONABLE SUSPICION

{15} A reasonable suspicion is a "particularized suspicion, based on all the circumstances" that the individual being detained is breaking or has broken the law. *Jason L.*, 2000–NMSC–018, ¶ 20, 129 N.M. 119, 2 P.3d 856. "A reasonable suspicion of criminal activity can arise from wholly lawful conduct." *State v. Urioste*, 2002–NMSC–023, ¶ 10, 132 N.M. 592, 52 P.3d 964 (quoted authority omitted). However, reasonable

suspicion may not be based on " '[u]nsupported intuition and inarticulate hunches.' " *Jason L.*, 2000–NMSC–018, ¶ 20, 129 N.M. 119, 2 P.3d 856 (quoting *State v. Cobbs*, 103 N.M. 623, 626, 711 P.2d 900, 903 (Ct.App.1985)). "In determining whether reasonable suspicion exists in a particular case, 'the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of noncriminal acts.' " *Urioste*, 2002–NMSC–023, ¶ 10, 132 N.M. 592, 52 P.3d 964 (quoting *United States v. Sokolow*, 490 U.S. 1, 10, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)).

{16} Because Defendant was not seized until he submitted to the detective's show of authority after he had fled, we must decide whether Defendant's flight upon the arrival of the detectives becomes a part of the totality of the circumstances to be considered in determining reasonable suspicion. We agree with the Court of Appeals that we have before us an issue of first impression in New Mexico.[2] Further, because Defendant did not ask the Court of Appeals to apply a different standard under Article II, Section 10 of the New Mexico Constitution, the Court of Appeals correctly turned to the United States Supreme Court's holding in *Wardlow* to decide this case under the Fourth Amendment.[3]

{17} In *Wardlow*, two officers, who were driving in a four-car caravan in an area known for heavy narcotics trafficking, noticed Wardlow standing next to a building

---

**2.** Defendant argues, based on three New Mexico opinions, that the issue before us is not one of first impression; he frames the issue as "whether or not an officer is acting lawfully when he demands cooperation from a defendant who would otherwise leave." We disagree with this characterization and do not find any of the cases that Defendant cites to be helpful on the question of whether Defendant's flight from the detectives can be considered in determining reasonable suspicion. *See State v. Tapia*, 2000–NMCA–054, ¶ 14, 129 N.M. 209, 4 P.3d 37 (addressing whether an officer's actions must be lawful to fall within the officer's official duties); *State v. Prince*, 1999–NMCA–010, ¶ 18, 126 N.M. 547, 972 P.2d 859 (recognizing defendant, who had voluntarily spoken with officer for fifteen minutes on defendant's porch, could not be ordered to remain outside absent an arrest or lesser detention justified by reasonable suspicion of criminal activity); *State v. Frazier*, 88 N.M. 103, 104–

05, 537 P.2d 711, 712–13 (Ct.App.1975) (stating officer acting in civil matter and who admitted no grounds for believing the defendant was committing or had committed a criminal offense when he stopped her was not justified in conducting an investigatory stop).

**3.** We leave open the possibility that Article II, Section 10 may require different standards than those set forth in both *Hodari D.* and *Wardlow*. *See, e.g., State v. Nicholson*, 188 S.W.3d 649 (Tenn.2006) (declining, on very similar facts to the instant case, to adopt holdings of *Hodari D.* and *Wardlow*, and finding greater protection as a matter of state constitutional law). Even if Defendant preserved his argument for greater protection under our state constitution at the trial court level, he nevertheless abandoned it on appeal.

and holding an opaque bag. 528 U.S. at 121–22, 120 S.Ct. 673. Wardlow looked in the officers' direction and then fled. *Id.* at 122, 120 S.Ct. 673. The officers pursued Wardlow, overtook him, and detained him. A protective patdown frisk yielded a loaded .38 caliber pistol which led to Wardlow's arrest and conviction for unlawful use of a weapon by a felon. *Id.* The United States Supreme Court held that the officers had reasonable suspicion to detain Wardlow briefly and subject him to the frisk. *Id.* at 125, 120 S.Ct. 673. The Court acknowledged that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.* at 124, 120 S.Ct. 673. However, the Court held that the combination of Wardlow's presence in an area of heavy narcotics trafficking combined with his "unprovoked flight upon noticing the police," gave rise to reasonable suspicion to support an investigatory stop. *Id.* at 125, 120 S.Ct. 673. The Court explained that this holding was

> entirely consistent with [its] decision in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where [it] held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. And any refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure. But unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite.

*Id.* (citations and quoted authority omitted).

▮ {18} Analyzed under the *Wardlow* standard, this case presents a strong factual basis for finding that the officers had a rea-sonable suspicion to detain Defendant briefly and investigate his potential role in a multiple person drug sale. Defendant was not simply present in a high-crime area; he was standing in a group of eight to ten people with an individual known to have just completed a drug sale. Then, when several officers arrived at the scene, he hurried away in the opposite direction. Defendant's flight under these circumstances, taken together with Detective Soto's testimony that he was familiar with multiple-person drug sales,[4] is clearly sufficient for reasonable suspicion under *Wardlow* to permit Detective Soto to pursue Defendant and subject him to a brief investigatory stop.

{19} We recognize that the *Wardlow* analysis ultimately turns on whether the Defendant's flight was provoked or unprovoked. *Id.* at 124, 120 S.Ct. 673 (stating reasonable suspicion founded on the defendant's presence in high crime area combined with "unprovoked flight upon noticing the police"). The lack of provocation is critical. We agree with the position of the Eleventh Circuit Court of Appeals in *United States v. Franklin,* 323 F.3d 1298 (11th Cir.2003), acknowledging that "officers cannot improperly provoke—for example, by fraud—a person into fleeing and use the flight to justify a stop." *Id.* at 1302 (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)); *see also id.* at 1305 (Pogue, J., dissenting) ("The police may not frighten an individual into fleeing, and then assert his flight as a justification for pursuing and stopping him."); *People v. Thomas,* 198 Ill.2d 103, 259 Ill.Dec. 838, 759 N.E.2d 899, 905 (2001) (upholding denial of suppression motion despite officer's lack of reasonable suspicion at the time of attempted seizure because the officer "did not act without reason or for the sole purpose of provoking the defendant's

---

4. Officer Soto had been involved in narcotics investigations prior to this incident and was familiar with multiple person drug trafficking operations. He described how a multiple person drug trafficking operation works.

> [I]n the past dealings it's been my experience that dealers will oftentimes have somebody hold it for them, or they will have lookouts. Or I have seen it where dealers stashed the narcotics in one place. They make the deal and send somebody else to get it and come back. They hold the money. They don't hold the drugs themselves, so there is numerous situations where it's more than one person dealing on the street.

Based on his experience, Officer Soto testified that he felt the need to briefly detain persons believed to be associated with the operation for investigative purposes and for officer safety.

flight"). Thus, if police action at the moment of an *attempted* seizure is illegal and taken for the purpose of provoking flight, then flight in response to that action, being unlawfully provoked, may not be factored into the reasonable suspicion equation. To hold otherwise would create

> great opportunities for police mischief in the gulf lying between *Wardlow* and ... *Hodari D. Hodari D.* says that police pursuit, even when it makes apparent to the suspect a police intent to seize him, is not subject to Fourth Amendment limits. Surely it does not follow that such provocative activity may be deemed to provide the reasonable suspicion the police will need once they catch up with the suspect and take control of him.

4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.5(f), at 530–31 (2004) (footnote omitted); *see also Thomas*, 259 Ill.Dec. 838, 759 N.E.2d at 905 (agreeing that its holding was not to be construed as giving "a license to conduct investigatory stops in every case where a citizen ignores, or fails to heed, a baseless police order or show of authority").

{20} In the case before us, however, the record does not support a conclusion that Defendant's flight was unlawfully provoked. There is no evidence in the record of fraudulent conduct on the part of the police or actions taken "without reason or for the sole purpose of provoking [Defendant's] flight." *Thomas*, 259 Ill.Dec. 838, 759 N.E.2d at 905. The officers were acting appropriately in attempting to investigate a crime that had just occurred. The officers were legitimately present at the scene with probable cause to arrest Clark, who was known to have just completed a drug transaction. When the officers got out of their cars, Defendant fled. Given Defendant's proximity to the crime scene combined with the officers' need to maintain the status quo pending a brief investigation, and especially given the lack of record evidence that the police acted unlawfully to provoke Defendant's flight so as to justify his seizure, we conclude, by applying *Wardlow*, that the police had reasonable suspicion to pursue Defendant and subject him to a brief investigatory stop. *See generally* 2

Wayne R. LaFave, Jerold H. Israel, & Nancy J. King, *Criminal Procedure* § 3.8(b) (1999) (indicating that a brief investigatory stop is appropriate not only to prevent crime but to also help detect it and suggesting that, in the immediate aftermath of a crime, an officer may be entitled to freeze a situation for a short time to make inquiry and determine possible perpetrators).

## *JASON L.* IS NOT INCONSISTENT WITH *WARDLOW*

{21} Defendant relies on *Jason L.* to come up with a different result. *Jason L.* is the preeminent New Mexico authority applying the Fourth Amendment to determine what types of police conduct constitute a show of authority that, in the absence of flight, will effect a seizure. In that case, the defendant Jason L. and his friend Filimon M. were approached at night on an empty street by armed officers whom they knew had been observing them prior to the encounter. *Jason L.*, 2000–NMSC–018, ¶ 17, 129 N.M. 119, 2 P.3d 856. The officers demanded that the boys approach, inquired whether they had weapons, frisked Filimon M. and found a gun, and then frisked Jason L. and found another gun. *Id.* The defendant was charged with unlawful possession of a handgun and moved to suppress evidence. *Id.* The State argued that Jason L. was not seized until the police actually frisked him. *Id.* This Court held that Jason L. was seized prior to the search and that the officers lacked individualized suspicion at that point in time. *Id.* ¶¶ 19–21.

{22} In his petition for certiorari to this Court, Defendant claims that the Court of Appeals dispensed with *Jason L.'s* requirement of an "individualized, particularized suspicion" by following *Wardlow's* approach, which suggested that determinations of reasonable suspicion must be based on "commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125, 120 S.Ct. 673. However, this comment in *Wardlow* followed the Supreme Court's observation that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124, 120 S.Ct. 673. Thus, the Court's com-

ment came in the specific factual context of that case—a factual context that was not present in *Jason L.*

{23} We find nothing in *Jason L.* that is inconsistent with *Wardlow*. *Jason L.* presented a straightforward analysis under *Terry,* and did not involve flight upon arrival of an officer. *See Jason L.,* 2000–NMSC–018, ¶¶ 14, 16, 129 N.M. 119, 2 P.3d 856. Had the defendant in *Jason L.* run from the officers as they approached, then our analysis in that opinion would have been governed by *Wardlow.* Instead, the central issue in *Jason L.* was whether the defendant was seized when the police were speaking with him or not until they actually frisked him. In *Jason L.,* we concluded that because the officers demanded the boys approach, did not tell the boys they were free to leave, and used aggressive language or tone of voice indicating that compliance with their request was compulsory, the defendant would not have felt free to leave and was seized within the meaning of the Fourth Amendment prior to being frisked. *Id.* ¶ 19. On the other hand, *Wardlow* was not concerned with whether the defendant felt free to leave-both Wardlow and Defendant here *did* leave. *Wardlow* simply holds that unprovoked flight, when combined with presence in a high-crime area, provides the individualized reasonable suspicion to justify a *Terry* stop. *Wardlow,* 528 U.S. at 124–25, 120 S.Ct. 673.

{24} As discussed above, the officers here had reasonable suspicion under *Wardlow* to subject Defendant to an investigatory stop. The stop being valid, the ensuing seizure of drugs and paraphernalia was supported by the Fourth Amendment.

**INTERSTITIAL ANALYSIS**

{25} Defendant argues strenuously to this Court that the Court of Appeals should have conducted an interstitial analysis in accordance with *State v. Gomez,* 1997–NMSC–006, 122 N.M. 777, 932 P.2d 1, to determine whether the New Mexico Constitution affords greater protection to Defendant than the United States Constitution. Defendant contends that the Court of Appeals erred in "*sua sponte*" applying a federal analysis and adopting the position of the United States Supreme Court in *Wardlow* without conduct-

ing such an interstitial analysis. We granted certiorari on that basis only to find out that the issue had not been briefed to the Court of Appeals and was therefore abandoned.

{26} Without a state constitutional argument presented to the Court of Appeals, either in briefing or at oral argument, that Court was not required to conduct its own interstitial analysis. *See City of Santa Fe v. Komis,* 114 N.M. 659, 665, 845 P.2d 753, 759 (1992) (stating that the Court would not review issues not briefed on appeal); *Gomez v. Bernalillo County Clerk's Office,* 118 N.M. 449, 455, 882 P.2d 40, 46 (Ct.App.1994) (same). Nor did the Court of Appeals, absent a state constitutional argument before it, need to inquire about preservation in the trial court. The Court of Appeals properly analyzed this case under the Fourth Amendment and the relevant, binding United States Supreme Court precedent. *See Jason L.,* 2000–NMSC–018, ¶ 9, 129 N.M. 119, 2 P.3d 856 (reviewing claim only under Fourth amendment when defendant did not argue on appeal that the New Mexico Constitution afforded him greater protection than the United States Constitution); *Walters,* 1997–NMCA–013, ¶ 9, 123 N.M. 88, 934 P.2d 282 (limiting analysis to the Fourth Amendment when defendant advanced no separate analysis under the New Mexico Constitution nor argued that the state constitution affords greater protection).

**CONCLUSION**

{27} We affirm the opinion of the Court of Appeals reversing the district court's suppression of evidence and remand for further proceedings.

{28} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PAMELA B. MINZNER, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices.